[No. 1422.]

## FRANK CLANTON *v.* THE STATE.

1. PRACTICE—JURY LAW.—Two proposed jurors on their *voir dire* avowed that they had conscientious scruples in regard to the infliction of the punishment of death for crime, to that extent that they would not assess it upon circumstantial evidence. *Held*, that the proposed jurors were disqualified, and the trial court did not err in setting them aside.
2. PRACTICE—EVIDENCE—IMPEACHMENT OF A WITNESS.—Article 755 of the Code of Criminal Procedure provides that "the rule that a party introducing a witness shall not attack his testimony is so far modified as that any party, when facts stated by the witness are injurious to his cause, may attack his testimony in any other manner except by proving the bad character of the witness."
3. EVIDENCE—CASE OVERRULED.—In a prosecution for murder the State introduced several members of the grand jury which presented the indictment, to prove that the testimony of a State's witness before the grand jury was contrary to his testimony on the trial. The defense objected to this evidence upon the ground that it was in violation of the grand juror's oath as prescribed by the Code. But *held*, that while such evidence is not properly admissible for all purposes, nor in reference to all the proceedings of the grand jury, it is competent, when, in the judgment of the court, it is material to the due administration of justice. In so far as it announces the contrary doctrine, the case of *Ruby* v. *The State*, 9 Texas Ct. App., 353, is overruled.
4. EVIDENCE—MURDER.—See the opinion *in extenso*, and the statement of the case, for evidence *held* sufficient to sustain a conviction for murder in the first degree.

APPEAL from the District Court of Navarro. Tried below before the Hon. L. D. Bradley.

The indictment in this case charged the appellant and one Stony Broxon jointly with the murder of J. W. Norris, in the town of Rice, Navarro county, Texas, on the night of the twentieth of February, 1882. The appellant was alone upon trial, his co-defendant never having been arrested. The jury returned a verdict finding the appellant guilty of murder in the first degree, and assessed against him a life term in the penitentiary as punishment.

Mrs. Norris, the wife of the deceased, was the first witness introduced by the State. She testified that the dwelling house

occupied by herself and her husband stood about ten steps from the store house in which her husband, the deceased, conducted his business as a merchant and postmaster. On the evening of February 20, 1882, at about eight o'clock, the deceased came into the dwelling house from the store, and remarked that as it was chilly he would go out and get some kindling. Shortly after he left the room the witness heard the low, muffled sound of a human voice. In a few moments the deceased returned to the room in the dwelling, bringing the kindling, and asked the witness where he could find matches, telling her that there were some parties outside who wanted to get into the store. He got some matches, and from the dwelling went into the store. In a few minutes the witness heard two reports from a pistol. To these shots the witness paid no particular attention, thinking they were fired by some one in the streets, a practice very common at that time.

In a few minutes the deceased walked into the dwelling house, holding his hand over his chest, and said, "I am shot." The witness assisted the deceased to bed, and at his suggestion she went after the cook. With the assistance of the witness and the cook the deceased stood up in an unsteady and staggering manner, but soon commenced falling, and was laid down on the floor. The witness now despatched the cook for Doctor Melton. The deceased directed her to send for her brother, Mr. Slade. Doctor Melton and others arrived soon after the cook left. The witness asked him who did the shooting, and the deceased replied, "He told me to hold up my hands, and shot me." The deceased did not speak again, and died that night.

According to this witness, it had been raining that day; the ground was muddy; there was a new moon, and the night was clear and cool. The reports of the pistol had a muffled sound, as though fired in a house; but, as pistol shooting was a frequent occurrence in the neighborhood, the firing did not alarm the witness at the time. There was a safe in the store, containing a few valuables, but only a small amount of money.

On her cross-examination, the witness said that she saw none of the parties who did the shooting, nor did she go to the door when she heard the shots. Just before the deceased came back with the kindling, she heard the muffled voice of some one, but could not distinguish the words. She did not know whether the person who spoke was outside or inside of the store. The dwelling was in the rear of the store, but the buildings did not join.

The deceased opened the dwelling door, got some matches, and went into the store, saying that somebody wanted to buy something. Within the next five minutes the shots were fired; the witness thought just inside of the store door. The deceased came back into the dwelling and exclaimed: "I am shot; I am shot!"

Doctor Melton was the witness's nearest neighbor. Two traveling photographers occupied a store house just across the street, and opposite the store of the deceased. They were generally camped in a tent, but, on account of wet weather, occupied the store house that night by permission. The side door of the store of the deceased opened next to the witness's room in the dwelling. The front door of the store opened on the street. The traveling photographer came to the point opposite the store, which was not over fifty feet distant, on the Thursday before the Monday of the killing. The photographer was a stranger, and, though the witness was not positive, she believed that he came from Palmer, and had a family in that town. The voice which the witness heard was an indistinct mutter, and apparently proceeded from the gallery of the store.

The witness's cook was the first to arrive after the shooting; then Doctor Melton; then the young photographer; then the old photoprapher; then the witness's brother, Mr. Slade. The witness asked the old man to retire, as she thought too many were present. Both of the photographers, the witness answered to a direct question, arrived before Slade did. The young photographer's name was Shin. He came to the house within twenty or twenty-five minutes after the shooting.

Doctor Melton testified, for the State, that he was a physician by profession. He got to Norris's residence a short while after the shooting on the night of February 20, 1882, and saw Norris die a few minutes later. On that evening, at about half-past eight o'clock, the witness and Mr. Moore, the depot agent, went to Norris's store to get their mail. Norris closed his store door as the witness and Moore went out. A short while after the witness reached home, he heard two shots in quick succession at Norris's, but heard no disturbance. He started to Norris's house, and just outside of the gate met the cook, who told him that Mr. Norris had been shot. The witness hurried to Norris's room, and found him lying on the floor, half way between the chimney and the door. Norris told the witness that he had been shot, and was killed.

The witness, assisted by Mrs. Norris, ripped up three garments on the deceased in order to get at the wound, and as soon as the witness saw it he became satisfied that Norris could not have inflicted it himself. The witness thereupon asked him: "For God's sake, Norris, who did this?" The deceased replied: "He (or they) told me to throw up my hands and shot me." He did not speak again. The wound was in the breast, near but a little above the heart, and was the cause of his death. The ball went in a little oblique of transverse. It went in obliquely until it struck the breast bone, when it changed its course and went straight.

In going into his store at night the deceased always opened the rear door first, and, passing through the store, opened the front door. The photographers were fifty feet or more distant from Norris' store, and across the street. With the exception of a slight indentation over the left temple of the deceased, the wound was the only mark of violence on his person. The witness probed for the ball, which was of small calibre, but did not succeed in finding it. The witness was very friendly with Norris, and was his family physician.

Cross-examined, the witness said that the pistol must have been held on a level with Norris' breast. He did not know the size of the ball. It was small, however; the size perhaps of a large mould buckshot. He did not find the ball, and judged of its size only by the wound. The witness would not say that the ball struck squarely, but a little oblique of transverse. By transverse the witness meant that the party shooting shot straight forward,—square. By obliquely he meant slanting or edgewise, not square in front. The person who fired the shot must have been a little to the left, and on a level with the deceased. An oblique shot would make some difference in the size of the wound, because it would strike a larger surface. Distance would also make some difference in the size of the wound. The witness did not think that the ball which struck the deceased was spent, but, judging from the size of the wound, the person who shot the deceased must have stood but a short distance from him. The ball was not necessarily smaller than the wound. The witness probed for it as far as the breast bone, but could probe no further.

Judging from the locality of the wound, the witness was of the opinion that the man who did the shooting must have stood in the door. The witness could give no reason for this opinion except the muffled sound of the shot, and the nature of the wound.

The witness's statement as to where the party shot from was merely an inference of his, derived from his knowledge of the habits of the deceased, and his practice of opening the front door of his store from the inside. The shot had a deadened, muffled sound, as though fired in a house. A shot fired in the open air would have sounded quite differently. The shot which killed the deceased would have had a different sound had it been fired from across the street. Norris could not have been shot as he was, had he been standing at his safe.

Mr. Slade, brother-in-law and partner of the deceased, testified, for the State, that he did not actually see the deceased breathe his last breath, but reached him about ten minutes after he was shot. The witness found the store closed and went to see about it some fifteen or twenty minutes after the death of the deceased. He tried the door and found no key in it. The keys were afterwards found in the pocket of the deceased, where he customarily carried them. It had always been the practice to lock and bar the front door from the inside as soon as the mail was received, and to leave the store through the back door. The deceased opened his eyes once after the witness arrived, but did not speak. Mr. Grant, the photographer, was present when the witness arrived at the house.

Somewhat over an hour later, the witness went into the store the second time, but discovered no traces of violence, other than that the lamp had been moved from the spool cotton case, where it was generally placed. A place on the floor near a barrel of potatoes had the appearance of having been plowed by a bullet. The bullet was found in the floor near the front doors, on the next morning, and the witness inferred from the surroundings that it had been fired from the rear of the store. He could not remember whether it was a conical or a round ball, but it was mashed somewhat out of shape. The witness thought the ball was in the hands of the sheriff, and stated that he would know it were he to see it. There was no hole in either the door or window, and the door was locked and barred.

Jane Joiner, the cook of the deceased, testified, for the State, that she was either in the store room or the kitchen of the dwelling house when the shots were fired. She saw the deceased immediately after he came in, and heard him say, "call Jane." He fell as the witness got into the room, and said "send for the doctor and Jimmie Slade." The witness went for Slade, and the doctor came himself. The witness heard the deceased say

nothing more than the remarks stated. She did not hear him say how he got hurt. There were two doors and two rooms between the store and the kitchen. The shots sounded to the witness like they were fired in a house.

George Guynes testified, for the State, that he was at Broxon's house in the afternoon before the killing of the deceased. Tally Guynes and the defendant were there, but the witness did not see Stony Broxon. The defendant left Broxon's before the witness did, saying that he was going to "Old man Abe's," meaning Mr. Fanning's. The defendant had a pistol at Broxon's, but witness could not say that he had the pistol when he went away. This was all of the testimony of this witness which was at all material to the case.

J. W. Broxon, Sr., testified, for the State, that in February, 1882, he lived about two miles above Isaac Sessions, and about six miles north from the town of Rice. The witness lived about two miles distant from Fanning, and seven or eight miles from Shields. The witness was at home on the Monday night of the killing. The defendant lived at the witness's house at that time, but was not at supper that night nor at family prayers. The witness did not know whether or not the defendant was about the place on that evening at any time. He was at dinner on the day after the killing, but was not at breakfast on that morning. Tally Guynes was at the witness's house the whole of the night of the killing. The defendant was not about the house on that night when the witness went to bed. The witness had no conversation with the defendant on the day after the killing when he came to the house. If the defendant said anything about where he had been the night before, the witness paid no attention to it. When the defendant left the witness's house (presumably after the killing), he rather intimated to the witness that he was going west, and said that he was going with Tally Guynes. Tally Guynes was suffering from a sore foot at that time and could not walk well.

Mr. Farmer testified, for the State, that he was marshal of Fort Worth in February, 1882. He first saw the defendant after he was arrested in Fort Worth for murder. He did not arrest the defendant himself. The witness saw the pistol which the officers told him they took from the defendant, and identified the pistol shown him as the one. A man named Guynes was arrested with the defendant, for carrying a pistol.

James H. Maddox testified, for the State, that he was a deputy

sheriff and lived in Fort Worth, in February, 1882. He arrested the defendant at the freight depot of the Missouri and Pacific Railway. He had received a descriptive card of defendant from Mr. Duncan, of Dallas, and was on the look-out for him, and recognized him as soon as he saw him. He had a young man with him, who was arrested at the same time for carrying a pistol. The defendant walked around the north side of the depot when the witness approached him, and pulled his hat down over his eyes. The witness arrested him and his companion and took a pistol from each of them; both pistols were loaded with round balls. The small pistol he took from the defendant, the large one from the young man Guynes. The defendant appeared very much excited when arrested, and his face turned different colors.

Nothing of a material character was elicited by the cross-examination. The witness noticed the excitement of the defendant before he made the arrest. The witness did not see the defendant pull his hat down over his face, but when he approached him after he had passed around the depot, his hat had been pulled down. When the witness arrested the defendant, he asked him if his name was not Frank Clanton, and he said "yes," and made no effort to deny it. The freight and passenger depots are separated by a long distance. Many people do not congregate at the former, and it is not as public a place as the latter, and passengers do not get on or off the cars there.

H. P. West, who brought the defendant and Talley Guynes to the Navarro county jail from Fort Worth, identified the two pistols exhibited as the weapons turned over to him by Mr. Maddox as those which he, Maddox, took from the prisoners.

Tom Richberg testified, for the State, that in February, 1882, he lived in Navarro county, six miles from Rice, and remembered the killing of Norris. He had seen the defendant before, but did not see him on the twentieth of February, to know that it was him. The witness was traveling the road on the evening of the killing (Monday), and saw a man on the prairie, some distance from the road. This was about five miles distant from Rice, and was near Cedar creek. The witness was within about three hundred yards of the man. The man was on foot, and the witness did not notice his dress.

The next morning the defendant came to Mr. Wright's house before breakfast, and while the witness was there. In passing a few words with him, the witness asked him if he did not cross Cedar creek the day before, at a point which he designated, and

the defendant said that he did not; that he crossed that creek below that point, on his way to old man Shield's place. The point at which the witness saw the man on the evening of the killing was two miles from Broxon's, and four miles from, and north of, Rice, and on the route to that town.

Joe McCrary testified, for the State, that he lived on Mr. Sessions's place, and is in Sessions's employ. He got up very early on the morning after the murder of Norris, and went out to feed the horses. He looked towards Mr. Wright's house, and saw a man all drawn up in the fence corner, near Mr. Wright's house. He looked as if he was just getting up from the fence corner. It was hardly good light, but the witness could plainly see that it was a man.

Nelson Wright testified, for the State, that the defendant came to his house very early on the morning after the killing of Norris. The witness went out of his door, and saw the defendant standing near it. He said to him, "Halloo, Frank! What's the news?" The defendant replied, "Bad." The witness then told him to go in.

Cross-examined, the witness testified that the defendant had worked for him, and he knew him well. The witness went on and took breakfast at Broxon's. While he was at Broxon's, the defendant came there.

Abraham Fanning, sometimes called "Old Man Abe," testified that the defendant was not at his house on the evening or night of the killing of Norris.

J. W. Shields testified, for the State, that the defendant was not at his house on the evening or night of the killing. This witness's son Milton corroborated this statement.

E. G. Sessions, for the State, testified that he went to Slade & Norris's store three or four days after the killing of Norris, and saw the furrow plowed in the floor. The witness went into the store when no one was there, and found the furrow near the door. He saw the ball when it was picked up by Mr. Graham. It was mashed, and had the appearance of having been shot. It looked like a "navy six" ball, and rifle marks were plainly discernible on it. The witness would know the ball. He knew the deceased well, and knew him to be a quiet, peaceable man, who would have difficulties with no one.

On his cross-examination the witness stated that while he would not swear that the ball was fired from a pistol, it showed

the grains of wood on it. This ball, if fresh moulded, would fit a great many pistols.

Sampson Larkin testified that he saw the defendant and Talley Guynes in Norris's store on the Saturday preceding the shooting.

Alex Broxon, son of J. W. Broxon, Sr., testified, for the State, that he was living with his father at the time of the killing, and was there part of the time on Monday evening, the day of the killing. George Guynes, Talley Guynes, and the defendant were at the house when the witness left that evening. Stony Broxon, the witness's brother, left on that evening before the witness did, but returned about dark. Talley Guynes had a sore foot, and was at the witness's father's house on the night of the killing. The defendant came up to the house on the morning after the killing. The witness did not hear him say where he was going on the Monday evening when he left. Pistols were fired off about Broxon's house nearly every day. The defendant and Stony Broxon were firing off pistols on the Thursday after the killing.

The witness remembered a conversation which he had with Louis Haynie, at Rice, a short while after the killing. He told Haynie that he did not remember how many shots were fired on Thursday. The witness denied that he told Haynie that he, the witness, would not tell all that he knew, because he had been at expense. He first told Haynie that he had been at expense attending court in Johnson county, and did not want to attend court on that account, and therefore would not tell what he knew. The witness denied that he went to Ennis to see his brother, Stony Broxon. Stony left just after the killing, and has not been back since. The witness had never heard the defendant say where he had been. Talley Guynes was at the house the night of the killing, all night. The witness did not know that Clanton kept a pistol at the house of Broxon all the time after the killing, or not. Stony Broxon and the defendant both had pistols on Monday evening, when they left Broxon's house.

This witness on his cross-examination denied that he told Haynie that he wanted to see a detective, or that he told Haynie to telegraph him at Ennis. Haynie proposed the telegraphing himself, on Tuesday of the week after the killing. He did not say where Stony Broxon was. He left just after the killing to go to Waxahachie, and had not been back since, and the witness did not know his whereabouts. The witness did not know whether or not the defendant kept a pistol about him all the

time after the killing. The witness told Haynie in Rice, on Tuesday or Wednesday, after Clanton left, that he saw no difference in Clanton's manner on the day after the killing. He denied that he told Haynie in that conversation that Clanton muttered in his sleep all night. He denied that he told Haynie that the defendant told him, the witness, that he was going to Fanning's. The witness did not know that the defendant muttered all night. He muttered some.

L. B. Haynes, for the State, testified that he had two conversations with Alex Broxon, at Rice, a day or two after the killing, relative to what he, Alex, knew about it. One conversation was on Tuesday, and the other on Wednesday. Alex Broxon told the witness that the defendant told him that he was going to Fanning's on the Monday evening of the killing, when he left Broxon's house. Alex Broxon told the witness that the defendant acted strangely during the night after the killing, muttering in his sleep nearly all night. Alex did not ask the witness if he, Alex, could get a part of the reward when the detective came, if he told what he knew about it; but he did ask the witness about the reward, terms, etc. Alex told the witness that he was going to Ennis.

On his cross-examination the witness stated that it was an understanding between himself and Alex Broxon that he, Alex, was to be telegraphed for at Ennis when the detective arrived. The witness believed that he suggested the telegram; but, at all events, it was understood that the telegram should be sent. Alex Broxon did not voluntarily approach the witness, but the conversation transpired by "common consent—was mutual." Alex did not say that he was "informed" that the defendant was going to Fanning's on Monday, but he positively said that the defendant told him that he was going to Fanning's.

Milt. Malloy testified that he gave the pistol ball in evidence, and which was picked up in Norris's store after the killing, to W. D. Haynie, one of the grand jury. The ball was about the size of a buckshot, and would about fit the small pistol which is in evidence. The witness kept this ball from February 22 until he gave it to the grand jury.

Mr. Tarleton testified, for the State, that the defendant and Guynes came to his house, near Rice, on Friday after the killing, and stayed all night. The witness did not know how they got there, as, after the witness had retired, they came and hallooed. The witness asked who they were. One of them replied that he

was Guynes, and that Clanton was with him. They said that they supposed there had been a murder at Rice, and they would like to hear the particulars. The witness did not know whether it was Guynes or Clanton who made the remark. He replied that he knew no more than that Mr. Norris had been killed. These two parties left early next morning, and said that they were going to Ennis. The witness kept a "sort of a boarding house," and thought nothing strange of them coming there at the time.

George Meredith testified, for the State, that, on Friday after the killing, he saw a man on the roadside near Rice, who, if he was not the defendant, resembled him very much. Another man was with him, lying down, and apparently asleep.

The testimony of Talley Guynes, reciting the confession of the defendant, with all the details of the crime, is condensed in the opinion of the court.

The opinion also recites the testimony of Doctor Melton, when he was recalled, to the effect that a person wounded as the defendant was, would have enough vitality left after being shot to close and secure a door.

Alex Broxon testified, for the defense, that his brother Stony was at home, six miles distant from the scene of the murder, on the night of the killing. He came to the house a little after dark, and was there with the family at supper and at family prayers. Talley Guynes was there also, suffering from a sore foot. The witness knew Talley's reputation for truth and veracity, and it was bad. This witness stated on his cross-examination that he did not know where Stony went to on Monday evening before the killing. He did not remember what he went to Ennis for, but he did not go to meet Stony and tell him to get out of the way.

Old man Broxon testified, for the defense, that his son Stony left his house on Monday evening, going in the direction of, and saying that he was going to the Shegog Ranch, and returned home between dusk and dark; after which he joined the family at supper and prayers, and remained in the house all night.

Cross-examined, this witness stated that he had learned since he reached the court house that an indictment had been found charging his son Stony with the murder of Norris. Stony, who was about nineteen years old, left just after the killing and has not since returned. The witness denied most positively that he stated in the presence of the members of the grand jury that his

son Stony was not at home on the night of the murder, and that he did not see Stony at breakfast next morning.

Some six or seven witnesses introduced by the defense to impeach Talley Guynes declared that his reputation for truth and veracity was bad.

The defense closed, and, in rebuttal, the State introduced Messrs. Onstott, Barnaby, Drane, Douglas, Haynie, and Gordon, each of whom testified that they were members of the grand jury which found the indictment in the case, and that Mr. Broxon, Sr., testified before that grand jury that his son Stony was not at home, at supper or at family prayers, on the night of the killing. This evidence was objected to by the defense.

J. C. Carter testified, for the State, that Stony Broxon passed his house on the evening of the killing, between sundown and dark, going toward Rice. The witness's house is four miles from Rice and about two and one-half miles from old man Broxon's.

D. C. Price testified that old man Broxon, in a conversation with him, told him that his son Stony was not at supper at home on the night of the killing. In answer to a question by the witness's wife, as to where Stony was, he said that Stony was at the Shegog Ranch and got home after bed time.

Several witnesses for the State supported the reputation of Talley Guynes for truth and veracity, pronouncing it good.

Motion for new trial set up:

1. That the court charged the jury contrary to the law of the case;

2. That the jury found contrary to the law; and

3. That the jury found contrary to the evidence.

The opinion of this court discloses all other facts material to the rulings.

*R. R. Gowan, R. S. Neblett,* and *R. E. Prince,* for the appellant.

*H. Chilton,* Assistant Attorney General, for the State.

WILLSON, J. The defendant was indicted, jointly with one Stony Broxon, for the murder of J. W. Norris, in Navarro county, on the twentieth day of February, 1882. He was tried alone, his co-defendant Broxon not having been arrested. The jury found him guilty of murder in the first degree, and assessed his punishment at confinement in the penitentiary for life.

J. W. Norris was, at the time he was murdered, postmaster of

the village of Rice in Navarro county, and was also engaged in the mercantile business at that place.  He kept the postoffice in his store house, which store house was situated a few steps only from his residence.  On the night of the twentieth of February, 1882, he was called from his residence to the store, and in a few moments after he left to go to his store two shots were fired, the sound of which appeared to be in the direction of and in the store, and immediately thereafter Norris returned into his residence, where his wife was, and exclaimed that he was shot. His wife asked him who had shot him, and he replied, "He told me to hold up my hands and shot me."  He died in a few minutes, without making any other statements than those above mentioned.  The cause of his death was a gun shot wound in the breast.  No person was seen about the store, nor any footprints, or other *indicia* of the assassin who perpetrated the murder, except a bullet which was found on the floor inside the store, somewhat battered and having the appearance of having been discharged from a firearm, and a place on the floor which presented the appearance of having been struck by a bullet. The store doors were found to be closed and locked, and the keys on the person of the deceased.

It would seem from this state of facts improbable that the shots were fired inside the store house, but this seeming improbability is explained by the testimony of Dr. Melton, a physician, who testified as a witness for the State.  He testified as follows: "A man shot like Norris would have enough sense and vitality to shut and lock the door, and put things in their proper places as against thieves.  There are many instances recorded in medical journals of the kind, particularly where internal hemorrhage is the cause of death.  It is not uncommon for a man so shot to close a door and carefully lock it.  Norris died from internal hemorrhage."  This same witness, who was the physician that examined the wound that produced the death of Norris, stated that it was a small wound, made apparently by a ball the size of a buckshot.  The bullet or ball found in the store house was of a size corresponding with the wound.

It may be safely assumed we think, from the evidence:  1. That J. W. Norris was shot and killed by some person other than himself.  2. That he was shot inside his store house, and that the instrument used in effecting his death was a pistol of small calibre.  3. That the killing was a deliberate murder, perpetrated doubtless in an attempt at robbery.  Having reached these con-

clusions, the next inquiry arising is: Was the defendant the assassin or one of the assassins who perpetrated the murder? Before proceeding, however, to discuss the questions which relate directly to this inquiry, we will dispose of some other points presented by defendant's bills of exception.

In the formation of the jury two of the persons summoned to serve as jurors in the case upon their *voir dire* stated, in answer to the question, "Have you any conscientious scruples in regard to the infliction of the punishment of death for crime?" that they would not hang a man on circumstantial evidence. The court held these persons to be disqualified to serve as jurors in the case, and stood them aside, over the objections of the defendant; to which action of the court the defendant duly excepted, and saved his exceptions by bill. In *Shafer* v. *The State*, 7 Texas Ct. App., 239, this precise question was decided, and it was held that the juror thus answering was disqualified, and that it was not error in the court to stand him aside. We think that decision well supported by both reason and authority, and shall adhere to it. (*The State* v. *Pritchard*, 15 Nev., 74; 1 Bish. Cr. Proc., Sec. 918.)

The purpose of the law is to provide a jury of men who will try the case fairly and impartially, both for the State and the accused, in accordance with the law and the evidence. Circumstantial evidence is competent and legal evidence, and a juror whose convictions are such that he cannot conscientiously enforce the law upon this character of evidence cannot be considered a fair and impartial juror. We think the court acted properly in standing aside the persons who by their own statements disclosed that they were not competent to fill the full measure of jurors in the case.

Another error assigned by defendant is in relation to the admission of certain testimony offered by the State. J. W. Broxon, Sr., the father of Stony Broxon, the party jointly charged with defendant with the murder of Norris, was asked by the State's counsel if he had not made certain statements to the grand jury in relation to his son's whereabouts on the night of the murder, and which statements were contrary to those made by him upon the trial. The defendant objected to the witness answering the questions; first, because the State could not be heard to impeach her own witness; and second, because the proceedings had before the grand jury could not be given in evidence in a case of this kind. The court overruled the objections and required the

witness to answer the questions, and defendant excepted. The prosecution afterwards introduced several of the grand jurors, who testified to the statements made before their body while in session, by the witness Broxon, in regard to the whereabouts of his son Stony Broxon on the night of the murder.

We do not think that the first ground of objection to this evidence is a good one. We think it is fully answered by Article 755 of the Code of Criminal Procedure, which provides as follows: "The rule that a party introducing a witness shall not attack his testimony is so far modified as that any party, when facts stated by the witness are injurious to his cause, may attack his testimony in any other manner except by proving the bad character of the witness."

The other ground of objection is more serious, and it is one which has been heretofore held by this court to be tenable. In *Ruby* v. *The State*, 9 Texas Ct. App., 353, this precise question was determined by this court, and it was held that testimony of the character under consideration was inadmissible. In that case the defendant sought to impeach a material witness for the State by laying the proper predicate and then proving that he had made statements before the grand jury in conflict with his evidence on the trial. It was objected by the attorney for the State "that the witness could not be made to disclose what he had sworn before the grand jury." The objection was sustained and the proffered evidence rejected, and it was held by this court that in this there was no error. The decision is based upon a construction of Article 384 of the Code of Criminal Procedure prescribing the oath for grand jurors, and which reads: "The State's counsel, your fellows', and your own, you shall keep secret, unless required to disclose the same in the course of a judicial proceeding in which the truth or falsity of the evidence given in the grand jury room in a criminal case shall be under investigation." The construction placed upon this article of the code was that it prohibited a witness from testifying to any matters which occurred in the grand jury room, except in the particular instance specified therein; that is, where he was required to do so in the course of a judicial proceeding in which the truth or falsity of the evidence given in the grand jury room in a criminal case shall be under investigation. If we adhere to this decision we must hold that the court below erred in admitting the evidence objected to, and for this cause, if for no other, reverse the judgment of conviction.

But, upon full consideration and mature reflection, and a more careful examination of the authorities, we are convinced that the decision of the question in the Ruby case is incorrect, and not supported by the great weight of authority. Mr. Wharton in his work on Criminal Evidence, Sec. 510, says: "It was at one time supposed that a grand juror was required by his oath of secrecy to be silent as to what transpired in the grand jury room; but it is now held that such disclosure, wherever it is material to explain what was the issue before the grand jury, or what was the testimony of particular witnesses, will be required." In support of the text, the author, in a note, cites numerous decisions of the highest authority in America. The text of Mr. Wharton is not fully sustained by Mr. Greenleaf (1 Greenl. Ev., Sec. 252), but it is founded upon more modern decisions, and we think, upon better reasons than the ancient rule which excluded such evidence upon the ground of public policy. The liberty and the life of the citizen may depend upon such evidence, as well as the enforcement of the laws of the land for the protection of society. Of course a prudent discretion should be exercised by the court in the admission of such testimony. It is not properly admissible for all purposes, nor in reference to all the proceedings of the grand jury. It is only when, in the judgment of the court, it becomes material to the administration of justice, that it should be allowed. Nor will it be received to impeach the finding of the grand jury, or to show what was the vote on the finding. (Whart. Cr. Ev., Sec. 510.) We conclude that the result of the most carefully considered decisions in this country is a contrary doctrine from the one announced by this court in *Ruby* v. *The State, supra;* and we therefore overrule that case in so far as it determines the question under consideration, and hold that the trial court did not err in admitting the evidence referred to.

We will now return to the inquiry as to the guilt of the defendant of this atrocious murder, and the sufficiency of the evidence to support the verdict of conviction.

The principal witness for the State is one Talley Guynes, who testified in substance that the killing occurred on Monday night. On the Saturday before the killing Stony Broxon, the defendant, and the witness were at the store of the deceased in Rice. Witness had been acquainted with defendant about three weeks when the killing occurred. They occupied the same room during that time, at Broxon's. On Sunday morning before the murder,

Stony Broxon, the defendant, and witness were talking about robbery a good deal. Witness remarked that "a fellow could make a pretty lucky haul on Norris now." Stony said we three were enough to go through him. Witness said, "I would not; that my foot was sore and he would know me, and that besides Norris was a friend of mine." Frank Clanton said he and Stony were enough by themselves. On the Monday evening of the killing Stony Broxon and the defendant Clanton left Broxon's about the same time, Stony Broxon leaving on horseback and Clanton on foot. Clanton went off in the direction of Rice, and said he was going to old man Abe's, meaning Mr. Fanning's, who lived somewhat in the direction of Rice. Witness saw Clanton no more until the next day. He also saw Stony Broxon the next morning. Stony Broxon returned that night—the night of the murder—but witness did not know what time in the night he returned, as he, witness, was asleep. Clanton did not return that night. Witness remained at Broxon's the night of the murder, and Stony Broxon was not there at supper, nor at family prayers, nor was Clanton. When Clanton left Broxon's on the Monday evening of the killing he had a pistol—the smaller of the two shown witness on the trial, or one exactly like it. On Friday after the killing defendant Clanton and witness left Broxon's together, to go west. Their agreement was to go to Weatherford, where Stony Broxon was to meet them, and then they three were to engage in the highway robbery business. Clanton and witness staid all night, Friday night, in Rice. They did not intend to stay there, but reached there too late for the train, and were compelled to remain over until next morning. Next morning they proceeded on their way, and on the road to Weatherford, witness states, he had a conversation with Clanton, in which Clanton confessed to him that he (Clanton) and Stony Broxon had killed Norris. The witness details this conversation as follows: "He told me he and Stony Broxon went to Grape creek, near Rice, and there Stony hitched his horse, and that they walked into town. They went to Norris's store, and Stony asked for some tobacco. Clanton thought he heard Norris inside, cocking his pistol. He said that he ordered him to throw up his hands and Norris would not do it; told him the second time to do it, and Clanton fired. Almost at the same time Stony threw his arm around Clanton and shot out the lamp which was in Norris's hand. He said that as soon as Norris got in the store and lit the lamp he told him to throw up his hands,

and that Norris did not throw up his hands, and that he, Clanton, fired. That Stony Broxon immediately on his firing ran round him, or threw his hands round him, and fired, shooting the lamp out. That he and Broxon then ran. That they had an agreement to meet up the railroad if anything should happen and they should get separated. That he failed to meet Broxon, and undertook to find his way back home, and got lost, and at daylight found himself near Mr. Wright's house on Mr. Sessions's place."

The evidence of this witness, if entitled to full credit, is unquestionably sufficient to sustain the conviction. We will concede, however, that he is an accomplice in the crime within the meaning of Article 741 of the Code of Criminal Procedure. Conceding this, the conviction cannot be sustained upon his testimony unless it is corroborated by other evidence tending to connect the defendant with the offense committed. We will now examine the evidence and ascertain whether or not this witness's statements have been corroborated to the extent required by the law:

1. The witness states that on the Monday evening of the murder Stony Broxon and the defendant Clanton left Broxon's about the same time, and the defendant went off, on foot, in the direction of Rice. This statement, if true, is material, and tends remotely to connect the defendant with the murder. It starts him in the direction of the place where the murder was perpetrated, and on the same evening of the murder. This statement of the witness is fully corroborated by other witnesses.

2. The witness Guynes further states that when Clanton left Broxon's on Monday evening he was armed with a pistol, and that he did not return to Broxon's until next morning. This statement, if true, tends also to connect the defendant with the murder. It arms him with the kind of weapon with which the murder was committed, and shows his absence from his home during the entire night of the murder. This statement was fully corroborated.

3. The witness states that Clanton, in attempting to return home from the scene of the murder, lost his way, and found himself next morning at daylight at Mr. Wright's house on the Session place. This statement is corroborated by Wright, who testifies that very early the next morning after the murder the defendant came to his house. This is a circumstance, remote it is true, but nevertheless a circumstance tending to connect the

defendant with the murder. It shows him to be abroad, away from his home, at an unusual hour of the day, and apparently without having any business which called him to that place at that early hour.

4. The witness states that Clanton shot Norris with the pistol he, witness, had loaned him, which was a pistol of small calibre. In corroboration of this, it is proved that Norris was shot with a pistol of small calibre,—that the ball found in the store house was a small one,—that when defendant was arrested he was found to have a pistol of small calibre, exactly similar to the one described by the witness, and the ball found in the store house exactly fitted this pistol. The corresponding size of the ball and the wound with the pistol found upon defendant a few days after the murder, are circumstances tending directly to connect him with the murder.

We think we have sufficiently shown from the evidence set forth in the record that the testimony of the witness Guynes is corroborated to the extent required by the law. It is not required that the corroboration should be conclusive. It is sufficient if it tends to connect the defendant with the offense committed. (*Nourse* v. *The State*, 2 Texas Ct. App., 304; *Davis* v. *The State*, 2 Texas Ct. App., 588; *Jones* v. *The State*, 3 Texas Ct. App., 575; *Hoyle* v. *The State*, 4 Texas Ct. App., 239; *Jones* v. *The State*, 4 Texas Ct. App., 529; *Myers* v. *The State*, 7 Texas Ct. App., 640; *Sims* v. *The State*, 8 Texas Ct. App., 230; *Harper* v. *The State*, 11 Texas, 1.)

There are other facts in evidence, testified to by other witnesses than Guynes, which tend to establish the guilt of the defendant, but it is unnecessary that we should refer to them. The court in its charge to the jury submitted the evidence fairly and fully in accordance with the rules governing in such cases, and we are of the opinion that the verdict of the jury is well supported by the testimony.

The other questions presented in the record by the defendant, and which we have not discussed, we consider immaterial, or not errors; and hence we pass them without comment.

The judgment is affirmed.

*Affirmed.*

Opinion delivered November 11, 1882.